**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT BECKLEY**

RUTH CRAWFORD
*Executrix of the estate of*
MARTIN H. CRAWFORD,

Plaintiff,

v. CIVIL ACTION NO. 5:25-cv-00729

RALEIGH COUNTY COMMISSION and
CORPORAL ROY MCDANIEL, JR. and
DEPUTY JACOB ELLER and
CORPORAL JASON REDDEN and
CORPORAL BO GARRETT and
SERGEANT GARY EPLING,
*in their individual capacities*.

Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending is Defendant Raleigh County Commission's ("RCC") Motion to Partially Dismiss [ECF 13], filed January 19, 2026. Plaintiff Ruth Crawford ("Ms. Crawford"), executrix of the estate of Martin H. Crawford ("Mr. Crawford"), responded in opposition [ECF 17] on February 2, 2026, to which RCC replied [ECF 18] on February 9, 2026. The matter is ready for adjudication.

**I.**

***A. Factual Background***

On December 12, 2023, Mr. Martin Crawford was allegedly suffering from an "obvious and serious medical and mental health emergency." [ECF 1 ¶¶ 33, 35–36]. Sherri Webster, a friend of Mr. Crawford, concerned with his safety, "called 911 to report [his] mental

health emergency and request a welfare check." [*Id.* ¶ 36]. "The transcript of the call confirms that Ms. Webster clearly stated the nature of the mental health crisis." [*Id.*]. She reported (1) he "recently disposed of his television sets because he believed someone was watching everything he did," (2) he believed "someone has stolen his identity," and (3) he was "not acting like himself; he was inebriated; had barricaded himself in his home; would not answer the door; was 'trying to gas himself to death,' and was 'talking out of his head' about Russia invading the United States." [*Id.*]. Corporal Roy McDaniel, Jr., Corporal Bo Garrett, Deputy Jacob Eller, Lieutenant Jason Redden, and Sergeant Gary Epling (collectively "the Officers" or "Deputy Defendants"), employed by RCC, were dispatched to Mr. Crawford's home following Ms. Webster's 911 call. [*Id.* ¶¶ 7, 37]. "[D]ispatch gave [the Officers] the reason for the welfare check: Mr. Crawford was 'talking about being suicidal'" and "had turned the propane gas on in his home because he believed that Russia had invaded the United States." [*Id.* ¶ 37].

Corporal McDaniel "was the first to arrive" to Mr. Crawford's home. [*Id.* ¶ 38]. Corporal McDaniel "was familiar with Mr. Crawford and his history of prior arrests . . . as well as his history of erratic behavior and mental health issues." [*Id.* ¶ 39]. Corporal McDaniel "had been to Mr. Crawford's home in August 2021 when [he] was arrested after allegedly shooting a firearm while intoxicated[, which] . . . resulted in the Circuit Court of Raleigh County ordering Mr. Crawford to be evaluated for competency." [*Id.*].

Corporal McDaniel "observed a heavy odor of gas coming out of the . . . residence and smoke coming from the chimney." [*Id.* ¶ 41]. Upon his arrival, Ms. Webster reiterated to Corporal McDaniel her concerns regarding Mr. Crawford's mental wellness and safety. [*Id.* ¶ 42]. Mr. Crawford refused to come outside or answer the door. [*Id.* ¶¶ 43, 51]. Thereafter, Corporal Garrett, Deputy Eller, Lieutenant Redden, and Sergeant Epling arrived to assist Corporal

McDaniel. [*Id.* ¶ 44]. Two family friends also arrived at Mr. Crawford's home and attempted to assist the Officers in enticing Mr. Crawford outside and deescalating the situation. [*See id.* ¶¶ 44, 54–57]. One of the family friends broke the glass door to enter Mr. Crawford's home, and "Mr. Crawford was heard shouting, 'I don't care, light it.'" [*Id.* ¶¶ 50–51]. Mr. Crawford "indicated, in his confused and mentally ill state, that he intended to light the propane tank" in the bathroom. [*Id.* ¶ 57]. The family friends on scene discussed with the officers "prior incidents involving Mr. Crawford's erratic behavior," and Corporal McDaniel allegedly discussed either friends and family or law enforcement "getting a mental hygiene order for the involuntary hospitalization of Mr. Crawford." [*Id.* ¶¶ 53–54].

Mr. Crawford was subsequently detained by the Officers and evaluated by Ghent Emergency Medical Services for gas inhalation. [*Id.* ¶¶ 58–61]. "Audio and video recording from the [Officers'] body cameras . . . reflect . . . [at the time of his arrest, the Officers] agree[ed] that Mr. Crawford needed to be evaluated for mental health given his presentation." [*Id.* ¶ 62]. "The [Officers] continued to direct bystanders that 'someone needed to leave like ten minutes ago and get a mental hygiene [order].' . . . The [Officers] discussed which Magistrate was on call and how long it would take to get a mental hygiene order." [*Id.*].

The on-scene Emergency Medical Technician ("EMT") was concerned about Mr. Crawford's mental condition. [*Id.* ¶ 63]. But before the EMT could complete his medical evaluation and before the mental hygiene process commenced or completed, the Officers (1) informed the EMT that Mr. Crawford would "'be going with them,'" and (2) "arrested and charged Mr. Crawford with obstruction and assault and placed him in the rear of [Corporal] McDaniel's cruiser . . . despite direct knowledge of Mr. Crawford's need for medical treatment." [*Id.* ¶¶ 64–65]. "[Corporal] McDaniel . . . transported Mr. Crawford to the Raleigh County Sherriff's Office .

. . .” [*Id.* ¶ 69]. During transport, “Mr. Crawford directly asked [Corporal McDaniel] if he could go to the hospital . . . [but] [Corporal] McDaniel never responded to Mr. Crawford’s request.” [*Id.* ¶ 70].

Corporal McDaniel “placed [Mr. Crawford] in a locked holding cell at 16:19 hours.” [*Id.* ¶ 71]. Corporal McDaniel did not remove Mr. Crawford’s shoestrings or jacket/sweatshirt hoodie string before locking Mr. Crawford in the cell “notwithstanding . . . actual knowledge that [Mr.] Crawford was experiencing suicidal ideations[.]” [*Id.* ¶ 72]. Further, neither the Officers nor any other agent or employee of RCC called for medical care at the time of placing Mr. Crawford in the cell. [*Id.* ¶¶ 72, 74]. Although two workstations were located directly across from Mr. Crawford’s cell, Corporal McDaniel worked in a separate patrol room outside of the line of sight of Mr. Crawford’s cell. [*Id.* ¶¶ 75–76]. The patrol room nevertheless housed monitors with a view of Mr. Crawford’s cell from the “camera located on the upper right corner” of the cell. [*Id.* ¶¶ 75–77].

“Shortly after being placed in the cell, Mr. Crawford went to the restroom area behind [a] privacy partition” outside of the line of sight of the security camera. [*Id.* ¶ 77]. Mr. Crawford removed either his shoestrings or a hoodie string, “tied the[m] around his neck, tied them to the handrail used for toilet seating assistance, and hung himself.” [*Id.* ¶ 85]. The video footage of Mr. Crawford’s holding cell details the events of his suicide. [*Id.* ¶¶ 78–80]. For 62 minutes -- from “16:19 hours to 17:21 hours” -- none of the Officers “or staff at the Sherriff’s Office monitored, observed, supervised or otherwise checked on Mr. Crawford in his cell.” [*Id.* ¶¶ 80, 82]. While “Mr. Crawford was left unattended in the cell,” Corporal McDaniel contacted another officer to confirm the mental hygiene order procurement. [*Id.* ¶ 81]. The officer confirmed and

stated Corporal "McDaniel could take Mr. Crawford to the Magistrate Office when . . . 'he wanted to.'" [*Id.*].

### *B. Procedural History*

On December 10, 2025, Ms. Crawford, on behalf of the estate of Mr. Crawford, instituted this action against the RCC and the individual officers who responded to the scene on December 12, 2023, including Corporal McDaniel, Deputy Eller, Corporal Redden, and Corporal Garrett. [*See id.*].

Counts I and II of the Complaint allege the Deputy Defendants exhibited deliberate indifference when they failed to protect Mr. Crawford from harm, [*id.* ¶¶ 105–29], and deliberate indifference to his medical needs by failing to provide adequate medical care, [*id.* ¶¶ 130–53]. Ms. Crawford further alleges six claims against RCC under both state and federal law, to-wit: negligent training (Count III), negligent supervision (Count IV), negligent retention (Count V), failure to train and widespread and persistent practice pursuant to § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978) (Count VI), negligence (Count VII), and violation of the West Virginia Human Rights Act (Count VIII). [*See id.* ¶¶ 154–273].

On January 19, 2026, RCC moved to partially dismiss the claims asserted against it. [ECF 13]. RCC contends dismissal is warranted inasmuch as the claims fail to plausibly allege it was negligent in its training, supervision, and retention of the Officers. [ECF 14 at 6]. RCC further argues the general negligence claim should be dismissed as duplicative. [*Id.* at 6]. Respecting the *Monell* claim for violation of § 1983, the RCC asserts Ms. Crawford's Complaint is "devoid of the requisite factual allegations concerning *how* [RCC] was negligent," and Ms. Crawford "makes no factual allegations at all about the [RCC]'s supervision, training, or retention of the individual [Officers]." [*Id.* at 9–15]. Respecting the alleged violation of the West Virginia

Human Rights Act, RCC contends Ms. Crawford fails to allege specific facts which would indicate RCC committed direct conduct for the purpose of causing physical harm or economic loss and instead "merely relies on conclusory allegations that such acts occurred." [*Id.* at 15–16].

In response, Ms. Crawford maintains she has pled sufficient facts which state plausible claims for negligent hiring, retention, and supervision by establishing RCC "was on notice of Mr. Crawford's mental health issues" and "their deputies' improper responses to him in the past." [ECF 17 at 5]. Ms. Crawford contends she has pled specific factual allegations showing RCC had persistent, improper practices regarding arrests and medical care during mental health crises concerning her *Monell* claim. [*Id.* at 6–8]. Ms. Crawford further contends dismissal of the West Virginia Human Rights Act claim is improper inasmuch as the law does not require plaintiffs to demonstrate RCC's conduct was done with the purpose of committing harm. Instead, she need only show there was discrimination based on disability which caused harm. [*Id.* at 9–10].

**II.**

*Federal Rule of Civil Procedure* 8(a)(2) requires that a pleader provide "a short and plain statement of the claim showing . . . entitle[ment] to relief." Fed. R. Civ. P. 8(a)(2); *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). Rule 12(b)(6) correspondingly permits a defendant to challenge a complaint when it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

The required "short and plain statement" must provide "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957), *overruled on other grounds*, *Twombly*, 550 U.S. at 562–63); *McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 585 (4th Cir. 2015). Additionally, the showing of an "entitlement to relief" amounts to "more than

labels and conclusions." *Twombly*, 550 U.S. at 558. It is now settled that "a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555; *McCleary-Evans*, 780 F.3d at 585; *Giarratano v. Johnson*, 521 F.3d 298, 304 (4th Cir. 2008).

The complaint need not "forecast evidence sufficient to prove the elements of [a] claim," but it must "allege sufficient facts to establish those elements." *Wright v. North Carolina*, 787 F.3d 256, 270 (4th Cir. 2015); *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (cleaned up). Stated another way, the operative pleading need only contain "[f]actual allegations . . . [sufficient] to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (noting the opening pleading "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."). In sum, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

The decision in *Iqbal* provides some additional markers concerning the plausibility requirement:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief. . . .'"
>
> Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief."
>
> In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the

> framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Iqbal*, 556 U.S. at 678–79 (citations omitted).

The Supreme Court of the United States has consistently interpreted the Rule 12(b)(6) standard to require a court to "accept as true all of the factual allegations contained in the complaint." *Pardus*, 551 U.S. at 94 (citing *Twombly*, 550 U.S. at 555); *see also S.C. Dep't of Health & Env't Control v. Com. & Indus. Ins. Co.*, 372 F.3d 245, 255 (4th Cir. 2004) (quoting *Franks v. Ross*, 313 F.3d 184, 192 (4th Cir. 2002)). The court is required to "draw[] all reasonable . . . inferences from those facts in the plaintiff's favor." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).

**III.**

***A. Common Law Negligence Claims (Counts III, IV, V, and VII)***

**1. Negligent Training (Count III)**

A negligent training claim focuses on whether "the employer was on notice of the employee's propensity (creating a duty) yet unreasonably failed to take action (manifesting a breach), resulting in harm to a third-party from the employee's tortious conduct." *Myers v. City of Charleston*, No. 2:19-CV-00757, 2020 WL 4195005, at *14 (S.D. W. Va. July 21, 2020) (cleaned up) (quoting *S.R. v. Fayette Cnty. Bd. of Educ.*, No. 2:15-cv-13466, 2016 WL 6886868, at *6 (S.D. W. Va. Nov. 21, 2016)) (granting motion to dismiss negligent training, supervision, and/or retention claims because "[p]laintiffs have not alleged whether the officers had prior complaints against them for excessive force or for failing to 'properly deal' with others with mental illness . . . [or] whether the [Defendant] was aware of the abusive conduct").

Count III alleges RCC "had a legal duty to properly train its employees . . . to monitor, observe, and supervise detainees so that their rights would not be violated." [ECF 1 ¶ 156]. Further, Ms. Crawford alleges "RCC improperly tolerated and implicitly approved prior acts of misconduct by its officers, including failing to protect detainees and providing appropriate medical care." [*Id.* ¶ 160]. This allegation is a legal conclusion insufficient to support a plausible claim for negligent training without further factual support. *See Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). As highlighted by RCC, "Plaintiff does not allege any facts to infer that *any* of its employees had committed similar [improper] practices in the past." [ECF 14 at 7]. The standard for a negligent training claim is whether the employer was on notice of its Officers' propensity to act tortiously, and while lower than its § 1983 counterpart, Ms. Crawford's claim remains implausible without further facts indicating notice.

Ms. Crawford alleges RCC "was on notice [Mr. Crawford's] calls were not being handled correctly" from Corporal McDaniel's previous interactions with Mr. Crawford in August 2021. [ECF 17 at 4]. But RCC correctly points out Ms. Crawford "fails to indicate in any fashion how prior interactions with [Mr. Crawford] were insufficiently handled" during a prior instance in 2021. [ECF 18 at 2–3]. Ms. Crawford's reply brief urges: "[u]pon information and belief, Mr. Crawford's need for a mental hygiene or other health care was not addressed on that [previous] incident, just as they were not on December 12, 2023." [ECF 17 at 4]. Beyond the mere mention of Corporal McDaniel's previous interaction with Mr. Crawford resulting in a competency evaluation by the state court, no corresponding factual allegations are pled. [*See* ECF 1 ¶ 39 (alleging Corporal McDaniel "was familiar with Mr. Crawford and his history of prior arrests . . . as well as his history of erratic behavior and mental health issues," and that Corporal McDaniel

"had been to Mr. Crawford's home in August 2021 when [he] was arrested after allegedly shooting a firearm while intoxicated[, which] . . . resulted in the Circuit Court of Raleigh County ordering Mr. Crawford to be evaluated for competency")]. This allegation is insufficient. Nor can the further allegations in the reply brief support the claim. *See Hierholzer v. Guzman*, 125 F.4th 104, 115 (4th Cir. 2025) (first quoting *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013)) (concluding "parties may not 'amend their complaints through briefing'"); and then quoting *U.S. ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 459 n.8 (4th Cir. 2013) ("[A plaintiff] cannot cure pleading deficiencies in the amended complaint with later-filed supporting documentation.")).

Accordingly, Ms. Crawford has not plausibly alleged a claim for state-law negligent training against RCC. Defendant's motion to dismiss is **GRANTED** and Count III is **DISMISSED WITHOUT PREJUDICE** to repleading on or before September 15, 2026**.**

**2. Negligent Supervision and Retention (Counts IV and V)**

"[F]or a negligent supervision claim to succeed [under West Virginia law], the employer must have a duty to . . . supervise its employee." *Camden-Clark Mem'l Hosp. Corp. v. Marietta Area Healthcare*, 252 W. Va. 324, 329, 922 S.E.2d 324, 329 (2025). "The question of whether the employer's duty to supervise the employee exists and extends to the plaintiff focuses on 'a connection between the employer's knowledge of the employee's dangerous propensities and the harm caused.'" *Id.* (citation omitted); *see also Tolliver*, 2021 WL 5056081, at *3 ("A negligent hiring, retention, and supervision claim focuses on an employer's liability for hiring, supervising, or retaining an employee 'whom the employer knew, or should have known, posed a risk to third parties.'") (citation omitted). "However, the extent to which an employer has a duty to a plaintiff

to supervise its employee is fact-dependent and includes considerations 'such as the work performed, the employees performing it, the size of the business, the type of work, and the employer's clientele, among others.'" *Camden-Clark Mem'l Hosp. Corp.*, 252 W. Va. at 329, 922 S.E.2d at 329 (citation omitted); *see also Weigle v. Pifer*, 139 F. Supp. 3d 760, 785 (S.D. W. Va. 2015) ("The risk to third parties posed by police work is considerable."). A claim of negligent retention requires the following inquiry:

> When the employee was hired or retained, did the employer conduct a reasonable investigation into the employee's background vis a vis the job for which the employee was hired and the possible risk of harm or injury to co-workers or third parties that could result from the conduct of an unfit employee? Should the employer have reasonably foreseen the risk caused by hiring or retaining an unfit person?

*Id.* at 784 (cleaned up) (quoting *McCormick v. W. Va. Dep't of Pub. Safety*, 202 W. Va. 189, 193, 503 S.E.2d 502, 506 (1998) (per curiam)). In the correctional context, the "relatively straightforward question" is: "[d]id the [employer] know, or should it have known that [the employee] posed a risk to inmate safety but fail to fire him or properly supervise him?" *Radford v. Hammons*, No. 2:14-CV-24854, 2015 WL 738062, at *8 (S.D. W. Va. Feb. 20, 2015).

Count IV of the Complaint alleges RCC "failed to properly supervise its employees . . . to ensure they did not violate the Constitutional or statutory rights of detainees." [ECF 1 ¶ 191]. Count V of the Complaint alleges RCC is "liable for its negligent retention of such employees, the negligent acts and omissions of such employees, and for their violations of clearly established duties." [*Id.* ¶ 202]. Ms. Crawford has not alleged "facts from which the Court can reasonably infer that [RCC] was on notice of [the Officers' alleged] propensity or how it unreasonably failed to take action, either through training or other disciplinary measures." *Tolliver*, 2021 WL 5056081, at *3 (citing *Westfall v. Osborne*, No. 2:20-CV-00118, 2020 WL 627145, at *6 (S.D. W. Va. Oct. 26, 2020)) (granting dismissal of negligent hiring, retention, and supervision

claims when plaintiff failed to plead sufficient facts indicating the employer knew of an officer's propensity to act tortiously or the employee's own propensity to act tortiously).

Ms. Crawford's negligent supervision claim fails for many of the same reasons the negligent training claim fails. Ms. Crawford fails to allege any facts which would indicate RCC knew or should have known the Officers posed a risk to third parties, such as Mr. Crawford, prior to the December 2023 incident. Ms. Crawford's negligent retention claim fares no better. Ms. Crawford alleges the RCC "had a policy and/or custom of inadequately and improperly investigating instances of its police officers failing to provide safety, protection, and medical care to detainees who exhibited symptoms of medical or mental health issues. . . ." [ECF 1 ¶ 214]. The legal conclusion is devoid of factual underpinnings. Further, the Complaint cites no prior incidents regarding these officers and hence no indication RCC should have reasonably foreseen the risk caused by retaining an unfit person or improperly investigating.

Accordingly, RCC's motion to dismiss is **GRANTED**, and Counts IV and V are **DISMISSED WITHOUT PREJUDICE** to repleading on or before September 15, 2026, inasmuch as Ms. Crawford has not plausibly alleged a claim for state-law negligent supervision and retention**.**

### 3. General Negligence (Count VII)

RCC contends Ms. Crawford's Count VII negligence claim is ultimately duplicative of her previous state law negligent training, supervision, and retention claims, and, as a result, the general negligence claim should be dismissed for the same reasons. [ECF 14 at 6]. Ms. Crawford responds the claim "encompasses broader allegations of negligence beyond just training, supervision, and retention." [ECF 17 at 8]. It is apparent, however, the negligence claim asserts

RCC breached a duty by (1) failing to screen, supervise, and train its agents, (2) failing to implement supervisory measures for detainees, and (3) "negligently managing and/or operating its premises . . ." among other similar allegations. [ECF 1 ¶¶ 253–54]. Inasmuch as Ms. Crawford's claim for general negligence is ultimately a recitation of her previous state-law claims, Defendant's motion to dismiss is **GRANTED**, and Count VII is **DISMISSED WITHOUT PREJUDICE** to repleading on or before September 15, 2026**.**

### *B.* **Monell** ***Liability for Violations of 42 U.S.C. § 1983 (Count VI)***

RCC next contends Ms. Crawford fails to sufficiently allege a *Monell* claim. [ECF 14 at 9].

In Count VI, Ms. Crawford alleges the RCC "developed and maintained policies or customs exhibiting deliberate indifference to the constitutional rights of persons . . . " and "had a pattern of practice of customs and policies that were inadequate and reckless in several aspects, including the failure to properly train. . . ." [ECF 1 ¶¶ 210, 212]. Also, "by failing to train its officers to detect common, obvious, and emergent medical and mental health situations of detained citizens, the RCC adopted a policy of deliberate indifference. . . ." [*Id.* ¶ 212]. Further, Ms. Crawford alleges the failure to "properly monitor and supervise police officers who previously failed to provide . . . mental health assistance to detainees suffering from medical or mental health issues. . . ." inasmuch as "a result of the above-described policies and customs, deputy sheriff officers of RCC, including Deputy Defendants, believed that their actions would not be properly monitored by supervisory officers. . . ." [*Id.* ¶¶ 212, 221].

#### 1. Governing Standard

"42 U.S.C. § 1983 provides an avenue for plaintiffs to file suit against any person who 'subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Johnson v. Baltimore City, Md.*, 163 F.4th 808, 821 (4th Cir. 2026) (quoting 42 U.S.C. § 1983). "'[M]unicipalities and other local government units' are 'persons' within the meaning of § 1983 and thus amenable to suit under the statute." *Id.* (quoting *Monell*, 436 U.S. at 690). However, "municipal liability attaches only when the decision maker is the municipality's governing body, a municipal agency, or an official possessing final authority to create official policy." *Howard v. City of Durham*, 68 F.4th 934, 952 (4th Cir. 2023) (cleaned up) (quoting *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999)).“ This policymaker involvement is required because, as the Supreme Court has made clear, *Monell* liability is not respondeat superior liability under a different moniker." *Id.*

"To hold a municipality liable for a constitutional violation pursuant to *Monell*, a plaintiff must establish 'the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights.'" *Johnson*, 163 F.4th at 821–22 (quoting *Howard*, 68 F.4th at 952). As summarized by the United States Court of Appeals for the Fourth Circuit, "[a]n official policy or custom may be expressed in four ways," including:

> (1) Through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifest[s] deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

*Id.* at 822 (quoting *Howard*, 68 F.4th at 952) (cleaned up).

**2. Persistent and Widespread Practice Amounting to a Custom**

"To prove a custom or practice . . . [the plaintiff] must show that 'a pattern of comparable practices has become actually or constructively known to responsible policymakers.'" *Howard*, 68 F.4th at 952 (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1391 (4th Cir. 1987)). Thus, a plaintiff may assert "custom or usage" *Monell* liability "only if its continued existence can be laid to the fault of municipal policy-makers, and a sufficient causal connection between the 'municipal custom and usage' and the specific violation can then be established." *Id.* at 952–53 (cleaned up) (quoting *Randall v. Prince George's Cnty.*, 302 F.3d 188, 210 (4th Cir. 2002)). Accordingly, "a plaintiff must point to a 'persistent and widespread practice of municipal officials, the duration and frequency of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their deliberate indifference.'" *Johnson*, 163 F.4th at 822 (quoting *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 402 (4th Cir. 2014)).

"[P]roof of a single incident of the unconstitutional activity charged is not sufficient to prove the existence of a municipal custom." *Id.* (cleaned up) (quoting *Semple*, 195 F.3d at 713–14) (granting dismissal where "the only specific instances [the plaintiff] allege[d] in support of her *Monell* claim are her own"); *see also Misjuns v. City of Lynchburg*, 139 F.4th 378, 386 (4th Cir. 2025) ("[T]here must be numerous particular instances of unconstitutional conduct to establish a custom or practice.") (cleaned up). "Sporadic or isolated violations of rights will not give rise to *Monell* liability; only 'widespread or flagrant' violations will." *Johnson*, 163 F.4th at 822 (quoting *Owens*, 767 F.3d at 403)).

Ms. Crawford alleges the RCC "had actual knowledge through prior incidents and internal communications about detainees in need of medical or mental health treatment, who threatened suicide, and presented a danger to themselves or others." [ECF 1 ¶ 235]. Further, Ms.

Crawford alleges the RCC "through patterns and customs, allowed improper conduct by its agents and employees, including Deputy Defendants, that resulted in the deliberate indifference to Mr. Crawford. . . ." [*Id.* ¶ 211]. However, in support of these allegations, Ms. Crawford cites only two specific incidents, both of which involve Mr. Crawford: (1) a previous arrest in 2021 where Mr. Crawford's conviction resulted in a need for a competency determination, and (2) the underlying incident in December 2023.

Further, Ms. Crawford alleges (1) Corporal McDaniel's choice to not utilize the monitoring room in front of Mr. Crawford's cell, and (2) the Officers intervening while the EMS technicians were evaluating Mr. Crawford indicate "ample evidence that this was how the group as a whole handled arrestees in mental health crises." [ECF 17 at 6]. While our Court of Appeals has acknowledged the "recitation of facts need not be particularly detailed," isolated incidents are insufficient to provide plausibility in a *Monell* claim. *Compare Owens*, 767 F.3d at 403 (allowing a *Monell* claim to proceed because plaintiff alleged "the existence of 'reported and unreported cases' and numerous 'successful motions'—which, if true, . . . buttress[ed] his legal conclusion"), *with Johnson*, 163 F.4th at 823 (denying a *Monell* claim because allegations providing a general accusation of a custom or practice of "routinely suspend[ing] officers for extended periods . . . is insufficient to cross the plausibility threshold").

In attempting to plead RCC was constructively or actually aware of improper conduct by its employees or the Officers, Ms. Crawford alleges only that "Defendant RCC had knowledge . . . that the constitutional and statutory violations as alleged herein were to be committed . . ." by virtue of having "access to records of prior investigations, arrests, and incarcerations involving Mr. Crawford." [ECF 1 ¶ 40]. *Cf. Fields v. King*, 576 F. Supp.3d 392, 409–10 (S.D. W. Va. 2021) (concluding the plaintiff had adequately alleged the Defendant had

actual or constructive notice of improper conduct and denying motion to dismiss because plaintiff alleged multiple specific incidents which resulted in multiple citizen complaints and lawsuits).

**3. Failure to Train/Supervise**

"For a municipality to be liable under § 1983 for failing to properly train police, the failure to train must 'amount[ ] to deliberate indifference to the rights of persons with whom the police come into contact.'" *Est. of Jones by Jones v. City of Martinsburg*, 961 F.3d 661, 671 (4th Cir. 2020) (alteration in original) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)). "If the City's failure to train reflects such a deliberate or consciously indifferent 'policy,' then its failure can fairly be said to be the 'moving force [behind] the constitutional violation.'" *Id.* at 671–72 (quoting *Harris*, 489 U.S. at 389) (alteration in original). "Additionally, the training deficiency 'must be closely related to the ultimate injury,' meaning it must cause the incident." *Id.* at 672 (quoting *Harris*, 489 U.S. at 389). "Because *Monell* liability cannot be predicated on a theory of *respondeat superior*, a single incident is almost never enough to warrant municipal liability." *Id.* (citing *Semple*, 195 F.3d at 713–14).

Moreover, "[a] supervisor may be held personally liable under [§] 1983 for a constitutional violation committed by a subordinate state or local government official where the supervisor's 'indifference or tacit authorization' was 'a causative factor' in enabling the violation." *Bolick v. Anderson*, 169 F.4th 528, 541 (4th Cir. 2026) (quoting *Shaw v. Stroud*, 13 F.3d 791, 798–99 (4th Cir. 1994)). Our Court of Appeals has articulated the following elements required to demonstrate a cause of action for supervisory liability under § 1983: (1) "the supervisor had actual or constructive knowledge that her subordinate's conduct 'posed a pervasive and unreasonable risk of constitutional injury,'" (2) "the supervisor exhibited 'deliberate indifference to or tacit

authorization' of the constitutionally injurious conduct," and (3) "some 'affirmative causal link' existed between the supervisor's inaction and the plaintiff's constitutional injury." *Id.* at 541 (quoting *Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014)).

Ms. Crawford argues her failure to train and supervise claims are plausible for many of the same reasons as she alleges there is a custom, but her claim fails for many of the same reasons. Ms. Crawford has not successfully pled her *Monell* claim based on an alleged widespread practice. Ms. Crawford claims the Complaint adequately alleges "[RCC] . . . failed to require appropriate in-service training or retaining [sic] of officers who were known to have deprived detainees of safety, protection, and adequate medical care." [ECF 17 at 8]. Yet, outside of the allegations regarding the December 12, 2023, incident being mishandled by the Officers, the Complaint does not allege any improper conduct or complaints that would give rise to RCC having actual or constructive notice.

Accordingly, Defendant's motion to dismiss is **GRANTED**, and Count VI is **DISMISSED WITHOUT PREJUDICE** to repleading on or before September 15, 2026**.**

### *C. WV Human Rights Act Violations (Count VIII)*

Section 16B-17-9(7)(A) of the West Virginia Human Rights Act, under which Ms. Crawford has asserted her claim, states:

> It shall be an unlawful discriminatory practice . . .
>
> (7) For any person, employer, employment agency, labor organization, owner, real estate broker, real estate salesman, or financial institution to:
>
> > (A) Engage in any form of threats or reprisal, or to engage in, or hire, or conspire with others to commit acts or activities of any nature, the purpose of which is to harass, degrade, embarrass or cause physical harm or economic loss or to aid, abet, incite, compel

> or coerce any person to engage in any of the unlawful discriminatory practices defined in this section;

W. Va. Code § 16B-17-9(7)(A) (2025). RCC argues Ms. Crawford failed to allege facts "attributable to" it acting "with a purpose to cause Mr. Crawford harm." [ECF 18 at 7]. Ms. Crawford further asserts she does not need to allege "proof that the defendant's conduct was done with the specific purpose of harassing, degrading, or causing harm." [ECF 17 at 9]. She asserts the West Virginia Human Rights Act "prohibits discrimination based on disability that results in harm." [*Id.*]. Ms. Crawford is correct in her belief inasmuch as the Act intends to proscribe discriminatory practices which cause harm, but the Act also details what "unlawful discriminatory practice" entails, which includes the specifically cited provision within the Complaint, § 16B-17-9(7)(A). *See generally* § 16B-17-9. Thus, to assert a discriminatory practice under the aforementioned section, Ms. Crawford must allege with particularity facts which indicate "any person . . . engage[d] in, hire[d], or conspire[d] with others to commit acts or activities of any nature, *the purpose of which* is to degrade, embarrass, or cause physical harm or economic loss. . . ." § 16B-17-9(7)(A) (emphasis added). It is thus incumbent upon Ms. Crawford to allege facts supporting the claim that RCC acted with purpose in its alleged discriminatory practices.

Ms. Crawford alleges "Deputy Defendants, as employees [of] Defendant RCC, engaged in unlawful discriminatory practices and ultimately caused the death of [Mr.] Crawford . . ." and "[t]he acts of [RCC], through the Raleigh County Sherriff's Department and its agents and employees created a hostile environment. . . ." [ECF 1 ¶ 264]. Ms. Crawford contends the Deputy Defendants acted with purpose, so RCC is liable for those purposeful acts.

RCC asserts Ms. Crawford failed to plead facts attributable to RCC. In answering a certified question, the Supreme Court of Appeals of West Virginia concluded plaintiffs brought

a claim under the West Virginia Human Rights Act directly against an insurance company when plaintiffs alleged: the "[Defendant] *by and through its agents, employees and representatives* . . . failed to properly, fairly and reasonably evaluate . . . because of [the plaintiffs' protected class]." *Michael v. Appalachian Heating*, 226 W. Va. 394, 398, 701 S.E.2d 116, 120 (2010) (emphasis added) (concluding an insurance company is a "person" for purposes of the Act). Further, the Supreme Court of Appeals subsequently recognized a claim alleging an entity "allowed or created an environment that was severely or pervasively hostile to its . . . residents based on their disabilities— . . . [came] within the conduct prohibited by [West Virginia Human Rights Act]." *Potomac Comprehensive Diagnostic & Guidance Ctr., Inc. v. L.K. by Young*, 250 W. Va. 102, 115, 902 S.E.2d 434, 447 (2024).

In support of Ms. Crawford's West Virginia Human Rights Act claim, she alleges "Deputy Defendants, as employees [of] Defendant RCC, engaged in unlawful discriminatory practices and ultimately caused the death of [Mr.] Crawford . . ." and "[t]he acts of [RCC], through the Raleigh County Sherriff's Department and its agents and employees created a hostile environment. . . ." [ECF 1 ¶ 264]. Treating all factual allegations as true, Ms. Crawford has failed to state a plausible claim for which a violation of the West Virginia Human Rights Act can be sustained. She has not pled any facts which would indicate the RCC acted with purpose to discriminate against Mr. Crawford and others based on their disabilities. Ms. Crawford has insufficiently pled facts indicating RCC aided or abetted the Officers in perpetuating discriminatory acts. Finally, Ms. Crawford has not alleged facts which indicate the environment permitted by RCC was severely or pervasively hostile, largely for the same reasons Ms. Crawford's other claims against the RCC fail inasmuch as one singular incident does not establish pervasiveness. *Cf. Potomac Comprehensive Diagnostic & Guidance Ctr., Inc.*, 250 W. Va. at 114,

902 S.E.2d at 446 (concluding specific allegations alleging (1) repeated "'ridicule' of children[, (2)]. . . violence against children, and . . . [(3) that] 'almost every child expressed fear . . . of staff members'" was sufficient to establish facts indicating severe and pervasive hostile environment).

Accordingly, Ms. Crawford has not plausibly alleged a claim for a violation of the West Virginia Human Rights Act against RCC. Defendant's motion to dismiss is **GRANTED**, and Count VIII is **DISMISSED WITHOUT PREJUDICE** to repleading on or before September 15, 2026**.**

**IV.**

Based upon the foregoing discussion, the Court **GRANTS** the Motion to Partially Dismiss [**ECF 13**] the Complaint and **DISMISSES WITHOUT PREJUDICE** Counts III, IV, V, VI, VII, and VIII to repleading in accordance with the *Federal Rules of Civil Procedure* on or before September 15, 2026. Failure to re-plead by this date will result in the entry of a show cause order by this Court.

The Clerk is **DIRECTED** to send a copy of this written opinion and order to all counsel of record and any unrepresented parties.

ENTER: August 31, 2026

Frank W. Volk
Chief United States District Judge